May it please the court, my name is still Eitan Kasteljanich, I'm representing Pamela Back in this appeal. Back filed her application for disability benefits in January of 2007, this is more than nine years ago, this case has gone on for an excruciatingly long time. The case went to district court once and there was a stipulated remand because there were a whole bunch of errors in the decision and the government agreed due over time. Went back to the same judge, the same ALJ, then prior to the second hearing there were 700 pages of additional medical records mostly from the VA which is where she gets her medical care and at her hearing she testified that she still is spending 90% of her time in the bedroom four days a week where she doesn't even get out of bed. She's got a combination here, there's depression, there's a pain disorder, she's on pain medication, she's got a very dysfunctional life. Anyway after looking at all the new evidence the ALJ wrote a decision that had exactly the same residual functional capacity assessment. Now that's not reversible error here but it's interesting because all that new evidence didn't change his mind one bit. So I'd now like to focus on the errors that he made the second time which were the ones he made the first time as well. There was an examining psychiatrist who evaluated Back at the request of Social Security in March of 2007, Shamim Nejad, and Dr. Nejad found that Back had some, may have, okay well here's one thing, she was crying at times during the evaluation. She wasn't doing that well. Dr. Nejad wrote that she may have some difficulty working on a consistent basis, being able to maintain regular attendance, being able to complete a normal work day, work week secondary to her underlying symptoms of depression. That's what he wrote in the body of his evaluation. The ALJ never mentioned these important findings. They're nowhere in the ALJ's decision. Now he also said that, had a conclusion statement basically saying that, I don't think she's disabled by her psychiatric stuff, and here's the important part, he said that significant chronic pain complaints secondary to her chronic medical illnesses, this would be the most significant barrier for her to engage in employment in the future, and that it was unlikely she would be able to deal with the usual stress encountered in a competitive workplace, secondary to her medical complaints that she has during this disability evaluation. Unlikely to be able to compete in a competitive workplace. The ALJ rejects this opinion from an examining psychiatrist because he's a psychiatrist, so what's he doing giving an opinion about how her chronic pain is going to affect her ability to work. Well pain's a funny animal, pain can be caused by physical problems, it can be caused by mental problems, mental problems can make physical pain problems worse. If the origin is physical or mental, if the claim is that that pain is causing me to respond not to do work, isn't that within the province of a psychiatrist? I believe so, and the thing is, in this case, the ALJ was not clear. Well what is her diagnosis? He's supposed to, you know, there's got to be a medically... But the doctors, I mean this is a very frustrating set of medical records to read because the doctors just couldn't figure out what the origins of the pain was. I mean she clearly was telling them that she was in extreme pain on occasion, but nobody seemed to be able to pinpoint it to anything. There's a valid diagnosis of fibromyalgia while she was still working, from before she even had stopped working. And so she has been diagnosed with fibromyalgia, but then they were also thinking maybe it's polyarthralgia. There's just, there were three or four alternative diagnoses, and the ALJ actually did an interesting thing, I've seen this done before, where he said, I'm going to find she has a medically determinable impairment of A or B or C or D, and I'm going to find that that combination, that A or B or C or D, I don't know which one it is, is a severe impairment, meaning it more than, has more than basic, it affects her ability to perform basic work activities. So that's what he says in step two. But you get down to the residual functional capacity assessment, and he, and in his analysis of Back's testimony, and he says, I reject her testimony about the pain she's experiencing because there's no valid diagnosis. He already said there was a valid diagnosis. You can't say she's got these medically determinable impairments in step two, and they're severe, and then get to step three and a half, which is where the residual functional capacity assessment is, and say, nah, they're not there, they don't exist, I'm going to reject her description of her pain because those diagnoses aren't really there. That's what he did here. Now, the ALJ, in addition to rejecting Dr. Najad's opinion, there was a non-examiner, Dr. Peterson, who had reviewed Dr. Najad's evaluation, this is way back when, this is probably in 2007, and she wrote that Back, here's a quote, may have some difficulties sustaining a normal 40 work week secondary to underlying symptoms of depression. So that's what the non-examiner said. Well, the ALJ rejected that as well, but her opinion, it's interesting because the evidence, it's a big file, and as you go through over time, there's more and more evidence from treating psychologists, a Dr. David, another treating psychologist, Dr. Marino, that noted that she was having all sorts of problems with her thinking, and I discuss all of these in my brief, I'm not going to repeat them here. So the ALJ basically rejected Dr. Peterson's opinion, but none of his reasons for rejecting that were legitimate. One of the things he said is, well, for example, Dr. Najad said there were no cognitive problems, the ALJ was wrong. Dr. Najad found that she couldn't calculate serial sevens, she was unable to remember more than three digits forward and one backward. That's a very significant cognitive problem. So the reasons, the ALJ's reasons for rejecting Dr. Najad's opinion were not legitimate. His reasons for rejecting Dr. Peterson's opinion, which was based on Dr. Najad's opinion, were not legitimate. And then once again, Dr. Hoskins and Dr. Turner appear with their non-examining opinions. In this case, there was not a Krista McDougall, there was not a non-physician who filled out the form, but we have two doctors that basically looked at the file and said, ah, she's okay. They didn't think she was that limited, but they never reviewed any records since March of 2007. This file goes right up through, her date last insured was December 2011, so there's almost four years of records. Part of the problem that your client seems to have with the ALJ is this problem of not being able to tie the pain to anything specific. So the ALJ says, okay, it's A, B, C, or D, because nobody's ever able to really tie it down to anything in particular. And then the ALJ finds that your client is not completely credible. So you, at the very beginning of your argument, began with the idea that she spends 90% of her time in bed. And yet there's evidence of her spending time, you know, hours out on the beach, so much so that she has to go in and get a sunburn treated by a doctor, that she goes to yoga on Thursdays, that she participates in the church choir, she's got kids to care for. All of those activities are inconsistent with the idea that she's spending 90% of her time in bed because she's got so much pain that she can't take it. It's a fair question. We're looking at a period of, the relevant period that we're looking at here is I think it's four years, about seven, eight, nine, ten. There's like five years, a five-year period. Over the course of five years, it's not that she never did anything. If you have to look at the overall, once again, waxing and waning, she didn't never do anything for five years. But there were large periods of time where she did not get out of bed because she was too depressed to do anything. She managed to get out of bed to go to her medical appointments with her mental health therapist. One of the things is we have to look at, when the ALJ rejects a claimant's testimony, because especially in a pain case or a mental health case, you really have to ask the claimant, what do you feel? I mean, tell us, what are you doing? What are your symptoms? And then you have to look, are those consistent with the medical evidence? Here the ALJ, for example, rejected her testimony about her pain limitations that she thinks are caused by fibromyalgia, but whatever, chronic pain, she's having all this pain. The ALJ rejected it in part because the imaging studies did not detect fibromyalgia. Well, imaging studies do not detect fibromyalgia, and the Beneke case had this exact same issue. You can't find a person not credible because imaging studies that can't detect something don't detect it. And she does have a legitimate diagnosis of fibromyalgia based on the trigger points, which can detect it, and the widespread pain. There's really not much of an objective test for fibromyalgia, is there? There is, but it's not x-rays and it's not MRIs. What they have is trigger point tests. They've got, a lot of it is observational and over the course of time, seeing that the person, you know, they have widespread pain. There's a long list, and there's social security rulings that discuss the criteria and that basically adopt the medical criteria for how do you diagnose fibromyalgia. But that's- This may not be on this record, but just I'm curious. You're saying that now there isn't an objective definitive test of fibromyalgia? Well there is. More of my curiosity than the record, but- There is. I mean, there is, for example, but the thing is the trigger points, some, a rheumatologist, a person who's knowledgeable about fibromyalgia can do the trigger, the tender points test, the trigger points, and determine that you have to have, I think it is 13 out of 18 of them. And so there are tests, but once again, they're not, it's not as clear cut as, you know, take an MRI and look, there's the herniated disc. You know, it's not something you can just see that clearly. So it is more of an art. It's somewhat more of an art. You're right. I got you. But the thing is, that's not even an issue here. The ALJ found that she had the severe impairment of fibromyalgia. The- Let's see, oh, here we go. He also claimed that there was no diagnosis of a chronic pain syndrome. Well, there were two psychologists at the VA, Dr. Lee and Dr. Hawley, who both diagnosed back with a chronic pain syndrome. I think that was back in 2007. He also rejected her testimony because she said she'd quit work in part because she wanted to be a full-time mom, but that wasn't the only reason. She'd been, that was one of the things that, he said she wanted to pursue childcare, whereas the record shows that she had reached a point where she was so overwhelmed by her pain that she couldn't, she just couldn't function in her job anymore. The ALJ points to the fact that she did some community service. Well, she had a, did 134 hours of community service over the course of a three to four year period. That's not the equivalent of work. Throughout this entire time in this record, she was taking methadone, which causes side things, and the evidence in the file from her treating psychologist is that she does. She comes in there, she's in a mental fog. The ALJ also erred here by improperly rejecting lay evidence, all of which was independent observations, which were consistent with her testimony, consistent with the medical evidence, and the ALJ did not give any germane reason to reject all of that evidence. Do you want to save a minute or two for rebuttal? Sure. Thank you. Thank you. May it please the court, the commissioner also requests that you affirm the district court's judgment in this case because the ALJ's decision is, again, supported by substantial evidence. The ALJ did not reject the opinions of Dr. Nejad or Dr. Peterson with respect to Back's mental impairments. The ALJ gave significant weight to those opinions. So as for Dr. Nejad, who examined Ms. Back, that doctor said that her mental impairments caused no significant barriers to employment. And I think it's important to go to exactly what this doctor said. But she did say that her ongoing pain and medical issues may cause some difficulty in this regard. So, first of all, he says that, I'm sorry, I don't know what the gender of this person is, but I'll refer to Dr. Nejad as a he. He said that she may have some difficulty, but, and then concludes that there are no significant psychiatric barriers that would prevent her from working at this time. With regard to her physical impairments, he says it's unlikely that she would be able to deal with a competitive workplace secondary to her medical complaints. So that's not based on my examination of her. She may have some difficulty working on a consistent basis, which seems like kind of a prerequisite for working. Well, but then later on, he says that that's based on her medical complaints, her complaints about pain. So the ALJ said, well, you're making this assessment based on what she told you, but she's not particularly credible because throughout this record, she's doing things like yoga, caring for her three children, volunteering at her church, walking her dog, doing yard work. There's a quote in the record that regular exercise has been amazingly helpful for her pain. That's at 1236. That's not the yoga that was suggested to her by her medical provider. I confess I don't recall exactly what it was, but I do know, and I can quote, that regular exercise, whether it's yoga or some other form of exercise, has been amazingly helpful for her pain. So it's just not the case. I thought that was all sort of suggested to her as... No, she reported that regular exercise was helpful for her. And when you look at... Her medical provider suggested that she... They did suggest it, and then when she did it, she found it helpful. So when you look at that in the record, you just can't say that this is a person who is essentially bedridden, which is what she testified at the hearing. So the ALJ is looking at the record as a whole, contrasting that record with Ms. Back's complaints, and then saying, well, if a doctor's gonna rely on her complaints about her medical conditions, I can't give great weight to that assessment because she's not particularly credible in describing the limiting effects of her pain. Similarly, Dr. Peterson adopted Dr. Nejad's assessment with respect to the mental impairments, and although she... Adopting that assessment, that although she may have some unspecified difficulties, that the ultimate conclusion was that there were no significant psychiatric barriers to employment for Ms. Back. So the ALJ also used this analysis of the record, which was supported by substantial evidence, to discount the lay witness statements, which he was permitted to do, those reasons being supported by substantial evidence. Unless there are any specific questions, I thank the court for your time. You had two minutes for rebuttal. Thank you. It's interesting. When a person complies with medical advice to exercise and do yoga, and it actually helps them, that's what they're supposed to do, that's what they're supposed to be doing, and that's not a reason to reject the opinions of the medical providers or reject her description of the symptoms she continued to experience, despite the fact that she was doing better because she was doing what they were telling her to do. Certainly, if she hadn't done it, the ALJ could have said she's not credible because she wasn't complying with the recommendation, but she did comply. She did what she could to get better because she wants to get better. Dr. Nejad did not just rely on her description of her complaints when he said that she would not be able to work, primarily because of the chronic pain. He had also reviewed two reports. One of them was from Dr. Tsai. That's the rheumatologist who had diagnosed the fibromyalgia, and the other is Dr. Merrifield. Dr. Merrifield had similar, he was a treating physician who described the problems she was having with her chronic pain, which Dr. Merrifield believed had a significant psychological component. Yeah, and that's why he referred her over to as a Boltwood, because he said he couldn't find the origins for the pain. He didn't know where they were coming from. And the thing is, well, you've got a legitimate diagnosis of fibromyalgia. Fibromyalgia can cause lots of pain. You've got degenerative diseases. That can cause pain. And you've got anxiety and depression, and those can cause pain. We don't know why exactly which pain is causing what is from which impairment here, but what we do know is that Back is experiencing pain, and her doctors, the physicians who've examined her have never questioned that, and she's on pain medication for it. And there's no reason, there's no convincing reason in this record to reject her description of her symptoms. Thank you. Thank you. Thank you, counsel, for your arguments. Very helpful. This was a fat file. Matters are submitted, and that takes care of our session for today.
judges: Ebel, Paez, Bybee